1

2

3

4

5

6

7

FILED & ENTERED

OCT 01 2012

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gae        DEPUTY CLERK

8

9

10

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

11    In re

12    **MATTHEW BANKS ASHWORTH,**

13          Debtor.

14

15

16

17

18

19

Case No.  8:11-bk-10946-RK

Chapter 13

**MEMORANDUM DECISION RE
DEBTOR'S OBJECTION TO CLAIM
NO. 2 OF CREDITOR KATHRYN
EHRGOTT**

DATE:    April 19, 2012
TIME:    9:00 a.m.
PLACE:  Courtroom 1675
           255 East Temple Street
           Los Angeles, CA 90012

20        This contested matter of Debtor Matthew Banks Ashworth's ("Debtor") Objection to

21 Creditor Kathryn Ehrgott's ("Creditor") Claim No. 2 came on for trial on April 19, 2012

22 before the undersigned United States Bankruptcy Judge.  Richard G. Heston, of the law

23 firm of Heston & Heston, Attorneys at Law, appeared on behalf of Debtor.  Scott Talkov

24 and Douglas A. Plazak, of the law firm of Reid & Hellyer, A Professional Corporation,

25 appeared on behalf of Creditor.

26        Having considered the testimony and other evidence received at trial, the court

27 issues this memorandum decision setting forth its findings of fact and conclusions of law.

28

1    I.    **PROCEDURAL BACKGROUND**

2        On January 21, 2011, Debtor filed a voluntary petition for relief under Chapter 13

3    of the Bankruptcy Code, 11 U.S.C, accompanied by a proposed Chapter 13 Plan.  *Joint*

4    *Pretrial Order ("JPTO")*, filed on January 13, 2012, *Stipulated Facts, ¶ 1.*

5        Ms. Ehrgott is a creditor of Debtor as a result of a stipulated Final Judgment

6    rendered in the divorce proceeding entitled, "Kathryn E. Ashworth, Plaintiff, vs.  Matthew

7    Banks Ashworth, Defendant," in the Chancery Court for Knox County, Tennessee, case

8    number 164023-3 and entered on October 31, 2006 (hereinafter referred to as "the

9    Tennessee Divorce Proceeding").  *JPTO, Stipulated Facts, ¶ 3.*  On February 17, 2011,

10   Creditor filed Claim No. 2 in the amount of $259,682.81 for Alimony.  *Claim No. 2, filed on*

11   *February 17, 2011.*  On February 17, 2011, Creditor also filed her objection to Debtor's

12   Chapter 13 Plan.  *JPTO, Stipulated Facts, ¶ 52.*

13       On June 24, 2011, Debtor signed an Amended Chapter 13 Plan, which was filed

14   on June 30, 2011.  *JPTO, Stipulated Facts, ¶ 54.*  This Amended Chapter 13 Plan was

15   filed by Debtor based on the reduction of his disposable income from Creditor's

16   garnishment of the payments described in the Final Judgment.  *Id.*

17       Debtor's Amended Plan classified and provided for payment to Creditor only as a

18   dischargeable general unsecured claim not entitled to priority treatment as a domestic

19   support obligation.  *Amended Chapter 13 Plan,* filed on June 30, 2011.  While Creditor

20   has not filed an objection to the Amended Chapter 13 Plan, the parties have stipulated

21   that her Objection to the Plan filed February 17, 2011 is an Objection to the Amended

22   Chapter 13 Plan.  *JPTO, Stipulated Facts, ¶ 55.*

23       On May 26, 2011, Debtor filed the instant Objection to Creditor Kathryn Ehrgott's

24   Claim No. 2.

25   II.    **FACTS**

26       The parties have stipulated to many of the facts as set forth in the joint pretrial

27   order filed on January 13, 2012.  *JPTO, Stipulated Facts, ¶¶ 1-56.*

28

1    Debtor and Creditor were married on June 12, 1999, in Athens, Georgia.  *JPTO,*

2  *Stipulated Facts,* ¶ 2.  They separated on April 24, 2005, while residing in Knox County,

3  Tennessee.  *Id.* They have two minor children from their marriage.  *Id.*  About six weeks

4  following their wedding, Debtor informed Creditor that he had ambivalent sexual feelings

5  and that he had experienced feelings of attraction to members of his same sex.  *JPTO,*

6  *Stipulated Facts,* ¶ 4.  Creditor informed Debtor that she would file for divorce if he

7  engaged in an extramarital affair.  *Id.*  Debtor agreed that he would advise Creditor if he

8  acted upon his attraction to members of the same sex.  *Id.*

9    During the marriage, Debtor's gross income increased by $109,000, from $41,000

10  in 1999 to $150,000 in 2006.  *JPTO, Stipulated Facts,* ¶ 5.  Debtor received several

11  promotions during this time in his capacity as a banker.  *Id.*  Debtor and Creditor moved

12  twice during the marriage and eventually resided in Knoxville, Tennessee.  *Id.*

13    For the first three years of their marriage, Creditor worked a school teacher with a

14  gross income of approximately $30,000.  *JPTO, Stipulated Facts,* ¶ 6.  After Creditor

15  gave birth to their first child on August 4, 2002, she remained at home and did not work.

16  *Id.*

17    On April 12, 2005, Debtor went to Atlanta, Georgia, on a business trip.  *JPTO,*

18  *Stipulated Facts,* ¶ 8.  During that trip, Debtor engaged in extramarital sexual relations

19  with a person of the same sex.  *Id.*

20    On April 13, 2005, Debtor returned home from his business trip, and subsequently

21  engaged in sexual intercourse with his wife, Creditor.  *JPTO, Stipulated Facts,* ¶ 9.

22    On April 18, 2005, Debtor developed flu-like symptoms, a swollen lymph node and

23  blisters or lesions in his groin area.  *JPTO, Stipulated Facts,* ¶ 10.  On April 24, 2005,

24  Debtor went to his doctor to inquire about the symptoms he had developed, and he

25  learned that his symptoms were caused by a sexually transmitted disease later confirmed

26  to be herpes simplex 1.  *JPTO, Stipulated Facts,* ¶ 11.  Debtor informed Creditor that

27  while on his business trip he had an extramarital affair with a person of the same sex.

28  *JPTO, Stipulated Facts,* ¶ 12.

3

On April 24, 2005, Creditor visited her doctor, who informed her that she had contracted a sexually transmitted infection that would later be diagnosed as herpes simplex 1. *JPTO, Stipulated Facts, ¶ 13.*

On April 25, 2005, Creditor met with a divorce attorney who filed her complaint for divorce one day later on April 26, 2005. *JPTO, Stipulated Facts, ¶ 14.* Creditor's divorce complaint demanded both temporary and permanent alimony. *Id.*

On April 26, 2005, Creditor visited a doctor who informed her that she was pregnant with her second child. *JPTO, Stipulated Facts, ¶ 15.* On April 28, 2005, Creditor visited the same doctor, who again confirmed that she was pregnant. *Id.*

On May 16, 2005, Debtor and Creditor agreed to an order of the court that provided Creditor with exclusive use of the family residence and temporary custody of their first child, with Debtor having co-parenting time. *JPTO, Stipulated Facts, ¶ 16.*

One June 20, 2005, Debtor and Creditor agreed to a second order of the court that provided, under the heading "Support," that Debtor would pay Creditor child support of $460 twice a month as well as a one time payment of $2,000 in addition to $380 per month in temporary spousal support through December 2005. *JPTO, Stipulated Facts, ¶ 17.* The June 20, 2005 agreed order required Debtor to pay the mortgage on the house that Creditor was living at, as well as her car payment and car insurance. *Id.*

On December 16, 2005, during the pendency of the Tennessee Divorce Proceeding, Creditor commenced a civil suit against Debtor entitled "Kathryn E. Ashworth, Plaintiff, vs. Matthew Banks Ashworth, Defendant", in the Chancery Court for Knox County, Tennessee, Case number 1-684-05, in which she sought to recover $5,000,000 in general damages and $5,000,000 in punitive damages as a result of allegedly contracting herpes simplex 1 from Debtor, with which he had become infected during the marriage as a result of an extramarital affair (the "Tennessee Civil Suit"). *JPTO, Stipulated Facts, ¶ 19.* The Tennessee Civil Suit alleged causes of action for Battery, Fraud and Misrepresentation, Intentional Infliction of Emotional Distress,

Negligence and Negligence Per Se.  *Id.*  Debtor filed an answer denying the allegations.
*Id.*

On December 29, 2005, while still married to Debtor, Creditor gave birth to a
second child.  *JPTO, Stipulated Facts, ¶20.*

On March 17, 2006, a hearing was held in the Tennessee Divorce Proceeding to
determine child support and alimony pendent lite during the pendency of the divorce,
among other issues.  *JPTO, Stipulated Facts, ¶22.*  The Chancery Court made oral
rulings on several matters relating to child support and alimony, but asked the attorneys
to draft an order for support that would be agreed to by Debtor and Creditor.  *Id.*

On July 17, 2006, *nunc pro tunc* to March 17, 2006, the Chancery Court in the
Tennessee Divorce Proceeding signed a document entitled "Order", which required
Debtor to "pay $100 per month, in addition to mortgage, car payment and all insurance
policies for [Creditor] as alimony pendent lite to [Creditor] . . . retroactive to January 1,
2006."  *JPTO, Stipulated Facts, ¶23.*  The Chancery Court expressly reserved the
calculation of any temporary alimony, above the support already provided in the order, to
be reserved for a future hearing.  *Id.*

On July 26, 2006, Debtor stipulated in writing in the Tennessee Civil Suit that he
"infected the plaintiff [Creditor], his wife, with the Herpes virus by engaging in unprotected
sex with her."  *JPTO, Stipulated Facts, ¶24.*  This reference is to herpes simplex 1.  *Id.*

The parties appeared in response to notices of deposition in the Tennessee
Civil Suit on September 29, 2006 for the purpose of being deposed in connection with
that proceeding.  *JPTO, Stipulated Facts, ¶25.*  On that date, the parties entered into an
agreed settlement of all claims arising in both the Tennessee Divorce Proceeding and the
Tennessee Civil Suit.  *Id.*  The agreed settlement was recited on that date and recorded
by stenographic transcription ("Settlement Transcript").  *Id.; Transcript of Proceedings,
September 29, 2006, Circuit Court for Knox County, Tennessee, Kathryn E. Ashworth v.
Matthew Banks Ashworth, No. 1-684-05 (Plaintiff's Trial Exhibit 40).*

At the September 29, 2006 settlement meeting, Debtor and Creditor discussed settlement of the Tennessee Civil Suit and the Tennessee Divorce Proceeding through counsel and themselves on the record as reflected in the Settlement Transcript. *JPTO, Stipulated Facts, ¶ 26; Transcript of Proceedings, September 29, 2006, Circuit Court for Knox County, Tennessee, Kathryn E. Ashworth v. Matthew Banks Ashworth, No. 1-684-05 (Plaintiff's Trial Exhibit 40).*

On October 31, 2006, Creditor executed a written "Release" of any and all claims asserted in the Tennessee Civil Suit. *JPTO, Stipulated Facts, ¶ 27.* Said Release recited that she released such claims in consideration of payment to [Debtor] of the sum of One Dollar ($1.00), and other good and valuable consideration, as set forth in the transcript of the Agreed Settlement, dated September 29, 2006, and the Final Judgment of Divorce filed in Knox County Chancery Court. *Id.*; *see also, Transcript of Proceedings, September 29, 2006, Circuit Court for Knox County, Tennessee, Kathryn E. Ashworth v. Matthew Banks Ashworth, No. 1-684-05 (Plaintiff's Trial Exhibit 40).*

On October 31, 2006, a Final Judgment containing the terms of the agreed settlement was entered in the Tennessee Divorce Proceeding. *JPTO, Stipulated Facts, ¶ 28; Final Judgment, Ashworth v. Ashworth, No. 164023-3, Chancery Court for Knox County, Tennessee (Plaintiff's Trial Exhibit 42)*, entered on October 31, 2006.  Pursuant to the parties' agreed settlement, in the Tennessee Divorce Proceeding, Debtor agreed and was ordered to pay Creditor in the Final Judgment, *inter alia,* the sum of "$306,000.00 as alimony" (the "Final Judgment Sum") payable in the amount of $1,500.00 per month, commencing November 1, 2006 and continuing for a period of 17 years and 2 months, until December 31, 2023. *JPTO, Stipulated Facts, ¶ 28; Final Judgment, Ashworth v. Ashworth, No. 164023-3, Chancery Court for Knox County, Tennessee (Plaintiff's Trial Exhibit 42)*, entered on October 31, 2006, at 3-4, ¶ 12. However, the parties further agreed that for the period from November 1, 2006 until May 31, 2008, Debtor would pay Creditor $1,000.00 per month, accruing the remaining balance of $500.00 per month, which deferred portions of the payment would become

1  payable, together with interest at 8%, on or before December 31, 2008. *Id.* On June 1,

2  2008, payments of $1,500.00 per month were to begin. *Id.* The Final Judgment also

3  included a provision that entitled Creditor to payment for any out-of-pocket medical costs

4  related to herpes treatment. *Final Judgment, Ashworth v. Ashworth, No. 164023-3,*

5  *Chancery Court for Knox County, Tennessee (Plaintiff's Trial Exhibit 42)*, entered on

6  October 31, 2006, at 4, ¶ 17; *see also, Trial Testimony of Kathryn Ehrgott,* April 19, 2012

7  at 11:09 a.m.  Creditor stated that those costs have totaled roughly $1,000. *Trial*

8  *Testimony of Kathryn Ehrgott,* April 19, 2012 at 11:10 a.m.  Creditor testified that she

9  could not have survived without all of these payments. *Id.* at 11:08 to 11:20 a.m.

10  Creditor also testified that it was her understanding that the terms of the Final Judgment

11  were based on her needs and the expectations she and Debtor maintained during their

12  marriage. *Id.*; *Direct Testimony of Kathryn Ehrgott in Support of Evidentiary Hearing on*

13  *Objection to Confirmation (Plaintiff's Trial Exhibit 119)*, filed on March 28, 2012, *at ¶ 51.*

14  Creditor stated that she did not intend nor communicate any intent that the Final

15  Judgment Sum served as a settlement of the civil suit. *Direct Testimony of Kathryn*

16  *Ehrgott (Plaintiff's Trial Exhibit 119)* at ¶ 62.

17      Debtor testified at his deposition that he believed the Final Judgment was agreed

18  upon to "settle all claims between my ex-wife and myself." *Deposition of Debtor Matthew*

19  *Banks Ashworth (Plaintiff's Trial Exhibit 105),* October 27, 2011 at 202:22-23. Debtor

20  testified at trial that based on the letters from Creditor's family law attorney to his family

21  law attorney, he would not be able to settle the issues in the divorce case without a

22  financial settlement of the civil lawsuit. *Debtor's Direct Testimony re: Objection to Claim*

23  *#2 of Kathryn Ehrgott,* filed on March 29, 2012, at 9-15.

24      The parties stipulated and agreed that the Final Judgment Sum would be identified

25  in the Final Judgment in the Tennessee Divorce Proceeding as "alimony," that the

26  obligation not be modifiable by either party, that the obligation would "not be

27  dischargeable in bankruptcy," that the obligation would terminate only upon the death of

28  Creditor and not that of Debtor or the remarriage of Creditor, and that the sums paid by

1  Debtor to Creditor pursuant to the obligation would be tax deductible by Debtor and

2  includible in the income of Creditor on state and federal tax returns.  *JPTO, Stipulated*

3  *Facts, ¶ 29; Final Judgment, Ashworth v. Ashworth, No. 164023-3, Chancery Court for*

4  *Knox County, Tennessee (Plaintiff's Trial Exhibit 42)*, entered on October 31, 2006, at 3-

5  4, ¶¶ 12-14.  The stipulation also required Debtor to "secure a term life insurance policy

6  to insure the $306,000 alimony obligation to [Creditor]."  *Id.* at 4, ¶ 13.

7          Creditor testified that the obligation would not terminate on remarriage because,

8  even if she were to remarry, she was concerned her positive herpes status would not

9  make her an attractive spouse for a man with economic means comparable to Debtor.

10  *Direct Testimony of Kathryn Ehrgott (Plaintiff's Trial Exhibit 119)* at ¶ 59.  Creditor

11  testified that if she were to remarry, she expected that man to be of "modest means."  *Id.*

12          Between 2006-2007, Creditor attended graduate school at the University of

13  Tennessee and earned a degree in social work.  *Trial Testimony of Kathryn Ehrgott,* April

14  19, 2012 at 11:21 a.m.

15          The Final Judgment also required Debtor to pay Creditor's legal fees as alimony in

16  $8,000 annual installments.  *JPTO, Stipulated Facts, ¶ 34; Final Judgment, Ashworth v.*

17  *Ashworth, No. 164023-3, Chancery Court for Knox County, Tennessee (Plaintiff's Trial*

18  *Exhibit 42)*, entered on October 31, 2006, at 5, ¶ 19.  In December 2007, after Creditor's

19  counsel refused his proffer of payment by credit card, Debtor instead paid the legal fees

20  with a lawful tender of coinage.  *JPTO, Stipulated Facts, ¶ 34.*

21          Debtor ceased paying the obligations described in the Final Judgment to Creditor

22  on June 1, 2009.  *JPTO, Stipulated Facts, ¶ 35.*  Payment of the obligations resumed

23  when his paycheck was garnished in 2011.  *Id.*

24          Creditor remarried in August 2007 and remains married at this time.  *JPTO,*

25  *Stipulated Facts, ¶ 33.*  Creditor returned to the work force, working in the field of social

26  work, two to three months after Debtor stopped making payments.  *Trial Testimony of*

27  *Kathryn Ehrgott,* April 19, 2012 at 11:24 to 11:25 a.m.  At trial, Creditor stated, "We tried

28

to make it work for a while on just my new husband's salary, but we couldn't.  I had to go back to work, it was against my will."  *Id.*

In 2008, Debtor deducted as alimony the amount paid to Creditor in 2007 from his 2007 federal and state income taxes.  *JPTO, Stipulated Facts, ¶ 36.*

In the spring of 2008, Creditor's petition to relocate with the parties' minor children was granted, and Creditor relocated from Tennessee to Indiana.  *JPTO, Stipulated Facts, ¶ 37.*

In February 2009, Creditor filed a petition under the Uniform Interstate Family Support Act ("UIFCA"), Indiana Code, Chapter 6, Section 31-18-6-1, to register the child support order issued in the Tennessee Divorce Proceeding in the Superior Court of the State of Indiana, County of Marion (the "Indiana UIFSA Proceeding").  *JPTO, Stipulated Facts, ¶ 38.*  That petition was granted and the Tennessee child support order was registered for enforcement in Indiana, and a child support withholding order was issued, directing Debtor's employer to withhold child support from his wages at the rate of $576.92 per week.  *Id.*

In April 2009, Debtor filed a petition in the Indiana UIFSA Proceeding to stay enforcement of the child support withholding order, seeking a stay until child support could be modified.  *JPTO, Stipulated Facts, ¶ 39.*  The petition was denied, and Debtor's petition for modification of child support was set for hearing on June 9, 2009.  *Id.*  On June 11, 2009, the Indiana trial court entered its order modifying child support to $500.75 per week, but adding thereto educational expenses of $231.00 per week, and entered a child support withholding order directing withholding of $731.00 per week from Debtor's wages.  *Id.*  Thereafter, the Indiana trial court entered a revised child support withholding order in the amount of $612.10 per week.  *Id.*

On July 2, 2009, Debtor appealed to the Court of Appeals of Indiana from the modified child support order and a child support withholding order entered by the Indiana trial court.  *JPTO, Stipulated Facts, ¶ 40.*  Among the errors Debtor assigned to the Indiana trial court was its failure to deduct the Final Judgment Sum paid to Creditor,

9

1  which is what Debtor described as alimony from his income, as the trial court found that

2  "the alimony awarded in the Tennessee decree was part of [Creditor's] property

3  settlement in the divorce.  In Indiana, such payment should not be included as 'income' to

4  [Creditor] and also deducted from [Debtor's] wages in the calculation of child support."

5  *Id.*  Specifically, Debtor argued to the Court of Appeal of Indiana that "There is absolutely

6  no evidence in the Tennessee Decree or anywhere else that the alimony being paid by

7  Father was part of the 'property settlement.'"  *Id.*  Because of this, Debtor requested that

8  his "alimony payments should be deducted from his Gross Weekly Income."  *Id.*

9      On July 22, 2009, Debtor filed a petition in the Tennessee Divorce Proceeding to

10 extinguish alimony obligation, maintaining the sums he had been ordered to pay Creditor

11 as described in the Final Judgment should be modified.  *JPTO, Stipulated Facts, ¶ 41.*

12 Specifically, Debtor argued that the sums described in the Final Judgment were unlike an

13 award of alimony *in solido* drawn from the parties' marital estate that could not be

14 modified.  *Id.*  Instead, the sums were modifiable as alimony *in futuro*, which was payable

15 from his future earnings.  Creditor argued that an award of alimony *in solido* can be made

16 based on expected future earnings and non-modifiable where the parties agree to such in

17 a marital dissolution agreement.  *Id.*

18      On July 15, 2010, the Tennessee trial court issued a memorandum order and

19 opinion denying Debtor's petition.  *JPTO, Stipulated Facts, ¶ 42.*  The court made specific

20 findings that the action the court had taken "was to approve and make enforceable an

21 agreement freely negotiated by these two individuals."  *Id.*, *citing*, *Holt v. Holt*, 751

22 S.W.2d 426, 428 (Tenn. Ct. App. 1988) as dispositive of the case, the Tennessee trial

23 court found that "[r]egardless of whether this Court would have had the statutory or

24 common law authority to impose alimony *in solido* based on the Defendant's future

25 earnings, the Defendant was free to agree to such an arrangement himself.  *Id.*  Because

26 his agreement is not violative of public policy, the court can think of no reason why the

27 negotiated settlement agreement between these parties should not be enforced

28 according to its terms."  *Id.*

1    On August 9, 2010, the Tennessee trial court entered judgment on Debtor's

2  petition to extinguish alimony.  *JPTO, Stipulated Facts, ¶ 43.*  The judgment found that:

3       Defendant's Petition to Extinguish Alimony Obligations is DISMISSED as a matter

4       of law.  The Court will not entertain any further Petitions with respect to

5       modification of the alimony obligation in this matter.

6  *Id.*  The judgment incorporated the July 15, 2010 memorandum order and opinion by

7  reference.  *Id.*  The judgment also taxed all court costs to Debtor to be paid to Creditor.

8  *Id.*

9       On August 27, 2010, Debtor met with Richard Heston, his current bankruptcy

10 attorney.  *JPTO, Stipulated Facts, ¶ 44.*

11      On September 16, 2010, the Court of Appeals of Indiana issued an opinion that

12 reversed the trial court, holding that "there is no evidence that the $306,000 alimony

13 payment to [Creditor] was part of her property settlement . . . ."  *JPTO, Stipulated Facts,*

14 *¶ 45.*  Instead, the Court of Appeals of Indiana agreed with Debtor that the sums

15 described in the Final Judgment were alimony that should reduce his child support.  *Id.*

16 The Court of Appeals of Indiana further remanded the issue of the deduction by Debtor of

17 the sums paid to Creditor as described in the Final Judgment in calculating child support.

18 *Id.*

19      Following the decision of the Court of Appeals of Indiana, holding that the sums

20 described in the Final Judgment were alimony which could be deducted from Debtor's

21 gross income for calculating child support, he continued to fail to pay the sums described

22 in the Final Judgment.  *JPTO, Stipulated Facts, ¶ 46.*  As of December 2010, Debtor's

23 arrearages of the sums described in the Final Judgment exceeded $28,000.  *Id.*

24      On December 22, 2010, Creditor filed a pleading arguing to the Indiana trial court

25 on remand that, although alimony is normally deducted from gross income, if Debtor's

26 "maintenance payment is not actually being paid, then it should not be included in the

27 calculation of child support for either party."  *JPTO, Stipulated Facts, ¶ 47.*

28

1    On December 22, 2010, the Indiana trial court heard the arguments of counsel for

2   Debtor and Creditor as to whether the unpaid alimony should reduce Debtor's gross

3   income or be considered income to Creditor.  *JPTO, Stipulated Facts, ¶ 48.*  The court

4   issued an income withholding order of $422 for child support that did not include the

5   sums described in the Final Judgment, finding that the "income withholding order of

6   $422.00/week does not reflect non-payment of spousal maintenance.  Therefore, non

7   deductable to his income or to her."  *Id.*

8    On January 7, 2011, Creditor filed a notice of entry of sister-state judgment in the

9   Superior Court of California for the County of Orange to collect the amounts described in

10   the Final Judgment.  *JPTO, Stipulated Facts, ¶ 49.*

11    On January 21, 2011, Debtor commenced this bankruptcy case by filing a

12   voluntary petition for relief under Chapter 13 of the Bankruptcy Code and his Chapter 13

13   plan.  *JPTO, Stipulated Facts, ¶ 50.*

14    On February 12, 2011, Creditor served Debtor with the notice of entry of sister-

15   state judgment.  *JPTO, Stipulated Facts, ¶ 51.*  Thereafter Creditor commenced

16   garnishment of Debtor's wages for collection of support and unpaid arrears on the

17   obligation described in the Final Judgment.  *Id.*

18    On February 28, 2011, Debtor was paid a bonus in the amount of $110,000 by

19   U.S. Bank.  *JPTO, Stipulated Facts, ¶ 53.*  Debtor's salary also increased by $11,000 per

20   year after January 21, 2011, but before June 24, 2011.  *Id.*

21   **II.    ANALYSIS**

22    This court has jurisdiction over this contested matter of debtor's objection to the

23   creditor's claim of Creditor pursuant to 28 U.S.C. §§ 157(b)(1), 157(b)(2)(B) and 1334

24   and Rules 3007 and 9014 of the Federal Rules of Bankruptcy Procedure.

25    For the reasons discussed herein, the court holds that the claim of Creditor is a

26   claim for a domestic support obligation under 11 U.S.C. § 101(14A) and is thus entitled to

27   priority claim status under 11 U.S.C. § 507(a)(1)(A).  As such, the Debtor's remaining

28

1  balance of the Final Judgment Sum is a domestic support obligation entitled to priority

2  claim status under the Code.

3  **A.    CREDITOR BEARS THE ULTIMATE BURDEN OF PROOF IN THIS
            CONTESTED MATTER**

4

5      "A proof of claim is deemed allowed unless a party of interest objects under 11

6  U.S.C. § 502(a) and constitutes 'prima facie evidence of validity and amount of the claim'

7  pursuant to Bankruptcy Rule 3001(f)."  *Lundell v. Anchor Construction Specialists, Inc.*,

8  223 F.3d 1035, 1039 (9th Cir. 2000).  The filing of an objection to claim "creates a dispute

9  which is a contested matter" under Federal Rule of Bankruptcy Procedure 9014.  *Id.*  The

10  objecting party bears the initial burden of controverting a proof of claim and must "come

11  forward with sufficient evidence and show facts tending to defeat the claim with probative

12  force equal to that of the allegations of the proofs of claim themselves."  *Id.* (internal

13  quotation marks omitted)*, citing, Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir.

14  1991).  To rebut a claim's presumption of validity, the objecting party must produce

15  "sufficient evidence to negate one or more of the sworn facts in the proof of claim," in

16  which case "the burden reverts to the claimant to prove the validity of the claim by a

17  preponderance of the evidence."  *Id.* (citation omitted).  The ultimate burden of

18  persuasion lies with the claimant at all times.  *Id.*, *citing, In re Holm*, 931 F.2d at 623.

19      Debtor has set forth sufficient evidence to rebut the presumption that Creditor's

20  claim is a domestic support obligation under federal law because, regardless of the state

21  court characterization of the award, whether the claim meets the definition of "domestic

22  support obligation" is a question of federal bankruptcy law and there is some evidence

23  indicating that there was a non-need component of payments labeled as "support" under

24  the stipulated Final Judgment, which is the basis of Creditor's claim.  As such, Creditor

25  bears the ultimate burden of proof in this contested matter.

26  **B.    FEDERAL DEFINITION OF "SUPPORT" GOVERNS**

27      Section 507(a)(1) of the Bankruptcy Code, 11 U.S.C., accords first-priority status

28  for "[a]llowed unsecured claims for domestic support obligations that, as of the date of the

1  petition, are owed to or recoverable by a spouse, a former spouse . . . ."  11 U.S.C.

2  § 507(a)(1)(A).  Section 507(a)(1) was added to the Bankruptcy Code in 2005 and

3  supersedes and replaces former Section 507(a)(7), which gave priority status to certain

4  claims for alimony, maintenance and support.  The term "domestic support obligation" is

5  defined in the Bankruptcy Code under Section 101(a)(14A), which provides:

6      The term "domestic support obligation" means a debt that accrues before,

7      on, or after the date of the order for relief in a case under this title,

8      including interest that accrues on that debt as provided under applicable

9      nonbankruptcy law notwithstanding any provision under this title, that is,

10          (A) owed to or recoverable by—

11              (i)    a spouse, former spouse, or child of the debtor . . .

12          (B) in the nature of alimony, maintenance, or support . . . of such

13              spouse, former spouse, or child of the debtor . . . without regard

14              to whether such debt is expressly so designated;

15          (C) established or subject to establishment before, on, or after the

16              date of the order for relief in a case under this title, by reason of

17              applicable provisions of—

18              (i)    a separate agreement, divorce decree, or property

19                  settlement agreement;

20              (ii)  an order of a court of record . . .

21          (D) not assigned to a nongovernmental entity, unless that obligation

22              is assigned voluntarily by the spouse, former spouse, child of

23              the debtor, or such child's parent, legal guardian, or responsible

24              relative for the purpose of collecting the debt.

25  Under this definition of domestic support obligation, three of the four required elements

26  are met as they do not appear to be in dispute: (1) the debt is owed to a former spouse,

27  § 101(14A)(A); (2) the debt was established before the order for relief (i.e., petition date)

28  by a divorce decree or an order of a court of record, § 101(14A)(C); and (3) the debt is

1    not assigned to a nongovernmental entity because Creditor has not assigned the debt to

2    anyone, § 101(14A)(D).

3         The parties dispute the remaining element: whether the debt owed to Creditor is

4    one in the nature of alimony, maintenance or support under 11 U.S.C. § 101(14A)(B).  As

5    a leading commentary on bankruptcy has observed, the definition of "domestic support

6    obligation" added to the Bankruptcy Code in 2005 "encompasses debts that were

7    considered alimony, maintenance or support under prior section 523(a)(5) [of the

8    Bankruptcy Code], but is broader in several respects."  *2 Resnick & Sommer, Collier on*

9    *Bankruptcy,* ¶ 101.14A at 101-93 (16th ed. 2012).  This definition includes not only

10   obligations owed to or recoverable by a spouse, former spouse or child of the debtor, or

11   child's parent, legal guardian or responsible relative, but also obligations recoverable by a

12   governmental unit and non-governmental units if voluntarily assigned for purposes of

13   collection.  *Id.*  Under prior Section 523(a)(5) of the Bankruptcy Code, to be excepted

14   from discharge "an obligation must have arisen 'in connection with a separation

15   agreement, divorce decree or other order of a court of record, determination made in

16   accordance with State or territorial law by a governmental unit, or property settlement

17   agreement . . . .'"  Former 11 U.S.C. § 523(a)(5) (2005), *cited and quoted in*, *4 Resnick &*

18   *Sommer, Collier on Bankruptcy*, ¶ 523.11 at 523-79.

19        Because the language of 11 U.S.C. § 101(14A) defining domestic support

20   obligation tracks the language of former 11 U.S.C. § 523(a)(5) and encompasses debts

21   under that former statute, the court concludes that case law interpreting prior Section

22   523(a)(5) is relevant and applicable in construing new Section 101(14A).  *In re Nelson*,

23   451 B.R. 918, 924 (Bankr. D. Or. 2011); *2 Resnick & Sommer, Collier on Bankruptcy,*

24   ¶ 101.14A at 101-93 – 101-95; *4 Resnick & Sommer, Collier on Bankruptcy*, ¶ 523.11 at

25   523-78 – 523-80; *Friedkin v. Sternberg (In re Sternberg),* 85 F.3d 1400 (9th Cir. 1996),

26   *overruled on other grounds, In re Bammer,* 131 F.3d 788, 792 (9th Cir. 1997); *Shaver v.*

27   *Shaver,* 736 F.2d 1314 (9th Cir. 1984).

28

1    Courts must look to the substance, not the form, of the obligation.  Section

2  523(a)(5) services several important public policy considerations, including:

3        [T]he protection of the spouse who may lack job skills or who may be

4        incapable of working, the protection of minor children who may be

5        neglected if the custodial spouse entered the job market, and the

6        protection of society from an increased welfare burden that may result if

7        debtors could avoid their familial responsibilities by filing for bankruptcy.

8  *Kritt v. Kritt (In re Kritt)*, 190 B.R. 382, 388 (9th Cir. BAP 1995), *quoting, Shaver v. Shaver*,

9  736 F.2d at 1316 n. 3.

10    Additionally, in *Sternberg,* the Ninth Circuit stated that "[I]n determining whether a

11  debtor's obligation is in the nature of support [under former 11 U.S.C. § 523(a)(5)], the

12  intent of the parties at the time the settlement agreement is executed is dispositive."  85

13  F.3d at 1405 (citations omitted).  The Ninth Circuit in *Sternberg* set forth various factors

14  for a trial court to determine "how the parties intended to characterize the obligation"

15  intent:

16        Foremost, the trial court should consider whether the recipient

17        spouse actually needed spousal support at the time of the divorce.  In

18        determining whether spousal support was necessary, the trial court should

19        examine if there was an imbalance in the relative income of the parties at

20        the time of the divorce decree. The trial court should also consider

21        whether the obligation terminates upon the death or remarriage of the

22        recipient spouse and whether the payments are made directly to the

23        recipient spouse and are paid in installments over a substantial period of

24        time. Finally, the labels given to the payments of the parties may be

25        looked at as evidence of the parties' intent.

26  85 F.3d at 1405 (citations and internal quotation marks omitted).

27    Whether a particular debt is "in the nature of" support or otherwise a "domestic

28  support obligation" for nondischargeability (and other bankruptcy) purposes is a question

1  of *federal bankruptcy law. In re Sternberg,* 85 F.3d at 1405, *citing, Shaver v. Shaver,* 736

2  F.2d at 1316; *see also,* 11 U.S.C. §§ 101(14A), 507(a)(1) and 523(a)(5).  The label given

3  the debt by the parties' marital settlement agreement or the state court judgment or order

4  is a factor, but not dispositive by itself.  *Shaver v. Shaver,* 736 F.2d at 1316; *Leppaluoto*

5  *v. Combs (In re Combs)*, 101 B.R. 609, 615 (9th Cir. BAP 1989).  It is up to the

6  *bankruptcy court* to determine whether the debt serves a predominantly child, spousal or

7  family support function.  *Id.*; *see also, Gionis v. Wayne (In re Gionis),* 170 B.R. 675, 681,

8  *affirmed,* 92 F.3d 1192 (9th Cir. 1996) (unpublished table decision); *Beaupied v. Chang*

9  *(In re Chang),* 163 F.3d 1138, 1140 (9th Cir. 1998).

10      However, in making its independent determination, the bankruptcy court may look

11 to state law for guidance on the question whether the state court intended to base the

12 award on need (indicating the debt serves a "support" function for nondischargeability

13 purposes).  *In re Gionis,* 170 B.R. at 682; *In re Chang,* 163 F.3d at 1140.

14 "Notwithstanding the above, when the state court domestic relations action is pending at

15 the time of the debtor spouse's bankruptcy proceeding, the bankruptcy court has

16 *discretion*—in the interest of "comity"—to defer to the *state court's* decision that a debt

17 owing to the nondebtor spouse is nondischargeable "support."  *Siragusa v. Siragusa (In*

18 *re Siragusa),* 27 F.3d 406, 408-409 (9th Cir. 1994).

19
20
   **1.      THE DIVORCE SETTLEMENT BETWEEN DEBTOR AND
           CREDITOR WAS INTENDED TO BE IN THE NATURE OF
           SUPPORT**

21
22      Considering the factors enunciated by the Ninth Circuit in *Sternberg*, the court

   finds that the intent of the parties in the Final Judgment was to create an agreement

23 providing support to Creditor under the definition provided by 11 U.S.C. § 101(14A).  *In re*

24 *Sternberg,* 85 F.3d at 1405.

25      First, it is necessary to decide whether the recipient spouse actually needed

26 support at the time of the divorce.  *In re Sternberg,* 85 F.3d at 1405.  As evidenced by the

27 phrase "foremost" in its opinion, the Ninth Circuit in *Sternberg* considered this factor to be

28

1  the most important in ascertaining the intent of the parties in characterizing the obligation.

2  *Id.*  In the case at bar, there is no doubt that based on the evidence, Creditor actually

3  needed spousal support at the time of the divorce.  Although Creditor's need for support

4  may have changed somewhat in light of her remarriage in 2007, the court under

5  *Sternberg* must make the determination of need based on "the time of the divorce."  *Id.*

6  Based on the evidence admitted at trial, the court finds that at the time of the final divorce

7  decree in 2006, there was an imbalance in the relative income of the parties.  When

8  Debtor filed for divorce in 2005, Creditor was unemployed and staying at home to take

9  care of the parties' oldest child, who was age 2 at the time, while also pregnant with their

10  second child.  *JPTO, Stipulated Facts, ¶ 5 and 20; Direct Testimony of Kathryn Ehrgott*

11  *(Plaintiff's Trial Exhibit 119) at ¶¶ 38 and 43.*  In contrast, Debtor was employed as a

12  banker with an annual salary of $150,000 in 2006.  *JPTO, Stipulated Facts, ¶ 5.*

13        However, the Debtor argues that his obligation under the Final Judgment had

14  nothing to do with support, but was a settlement of Creditor's personal injury claim

15  against him and that her primary motivation for the settlement was monetary

16  compensation for perceived damage inflicted by him.  *Debtor's Brief re Closing*

17  *Arguments re Debtor's Objection to Claim #2,* filed on May 4, 2012, at 6-10.  Debtor also

18  disputes the *continued* characterization of his obligation as spousal support, arguing that

19  Creditor had different intentions at the time of their agreement.  *Id.*  As Debtor points out,

20  Creditor remarried in 2007—less than one year after the Final Judgment was agreed

21  upon—and, thus, was arguably no longer in need of support.  *Id.* at 7-8 ("The testimony

22  actually shows that as soon as EHRGOTT 'nailed down' a 17-year stream of payments

23  equally an annual after-tax income of $18,000, she embarked upon the pursuit of a new

24  husband, meeting her current husband through the dating website www.eharmony.com

25  only months after reaching the settlement, and remarrying within the year."); *see also,*

26  *JPTO, Stipulated Facts, ¶ 33* ("KATHRYN remarried in August 2007 and remains married

27  at this time.").  As the evidence at trial also shows, Creditor had returned to school,

28  earned a graduate degree in social work at the University of Tennessee between 2006

18

and 2007 and gained employment in the field of social work in 2009. *Direct Testimony of*

*Kathryn Ehrgott (Plaintiff's Trial Exhibit 119)* at ¶ 55*; Trial Testimony of Kathryn Ehrgott,*

April 19, 2012 at 11:21 a.m.

Debtor argues that these facts, coupled with the circumstances surrounding the

nature of the settled claims, indicate that Creditor's intent was not to create a spousal

support obligation. *Debtor's Brief re Closing Arguments re Debtor's Objection to Claim*

*#2,* filed on May 4, 2012, at 6-10.

Regardless of whether Creditor may have had a secret intent to remarry as soon

as possible or re-enter the work force, the relevant inquiry in *Sternberg* to determine

whether the recipient spouse actually needed support is at the time of the divorce—not

what actions or events may have occurred afterward. Debtor does not offer evidence to

rebut the evidence showing a large imbalance between the incomes of the parties at the

time of divorce to justify a need for spousal support at that time. The case law in the

Ninth Circuit as reflected in *Sternberg* does not permit the exercise of the discretion by

bankruptcy courts to modify or reassess state court alimony decisions based on changed

circumstances of the parties after the divorce. *In re Sternberg,* 85 F.3d at 1405

("Foremost, the trial court should consider whether the recipient spouse actually needed

spousal support at the time of the divorce."); *In re Combs*, 101 B.R. at 615 (citations

omitted) ("[T]he court must ascertain the intention of the parties at the time they entered

in their stipulated agreement . . . and not the current circumstances of the parties.").

Moreover, Debtor already unsuccessfully tried that approach in the Tennessee

family law court, but that court rejected his attempts to modify the $306,000 award based

on a material change in circumstances. The Tennessee family law court held that the

award could not be modified. *Memorandum Opinion and Order, Ashworth v. Ashworth,*

*No. 164023-3, Chancery Court for Knox County, Tennessee (Plaintiff's Trial Exhibit 71),*

entered on July 15, 2010, at 4 ("[T]he defendant was free to agree to such an

arrangement himself. Because his agreement is not violative of public policy, the Court

1    can think of no reason why the negotiated settlement between these parties should not

2    be enforced according to its terms.").

3          Second, the court should consider whether the obligation terminates upon the

4    recipient spouse's death or remarriage.  *In re Sternberg*, 85 F.3d at 1405.  In this case,

5    Debtor's obligation to pay the award of alimony in the final divorce decree to Creditor

6    terminated upon her death, which could mean the parties intended the Final Judgment

7    Sum not to be support.  However, this factor that the obligation did not terminate on

8    remarriage alone is not dispositive.  *Id.* at 1405-1406; *Shaver v. Shaver*, 736 F.2d at

9    1316.

10         The court finds that Creditor's own testimony indicates that one factor motivating

11   the parties in entering into the divorce agreement was to resolve her tort claim against

12   Debtor.   At trial, Creditor expressed concern that her disease would preclude her from

13   attracting desirable partners, and sought compensation as a result.  *Direct Testimony of*

14   *Kathryn Ehrgott (Plaintiff's Trial Exhibit 119)* at ¶ 59; *Trial Testimony of Kathryn Ehrgott,*

15   April 19, 2012 at 11:08 to 11:20 a.m.  At trial, Creditor testified that were she to remarry,

16   she believed that her partner would be someone of "modest means," and desired

17   monetary protection as a result.  *Id.*  These statements are some evidence that Creditor's

18   intent was in part to seek monetary compensation for Debtor's infliction of a sexually

19   transmitted disease as opposed to support based on her need.

20         Finally, the labels given to the payments of the parties may be considered as

21   evidence of the parties' intent, although this, too, is not dispositive.  *In re Sternberg*, 85

22   F.3d at 1405.  In the final divorce decree, the label given to the obligation was "alimony,"

23   and the parties made recitations, acknowledging that they were waiving any rights to

24   spousal support, past, present and future.  The parties were represented by counsel who

25   assisted them in negotiating the terms of the consent divorce decree providing for the

26   payment of alimony, which indicates to this court that the parties gave great consideration

27   to the terms included in the agreements.

28

The agreement in the Final Judgment also allowed Debtor to claim the payments on his tax returns as alimony, or spousal support, and required Creditor to report them as income. *JPTO, Stipulated Facts,* ¶ 29. The evidence indicates that the Debtor followed through and declared the payments as "alimony" on his tax returns. *JPTO, Stipulated Facts,* ¶ 36. In a child support proceeding, Debtor also argued to the Court of Appeals in Indiana that the payments were alimony, in order to deduct them from his weekly income when calculating required child support payments. *JPTO, Stipulated Facts,* ¶ 40. It is telling that Debtor was so inclined to label and treat the payments as alimony for tax and child support purposes at first, but after he filed his bankruptcy petition, he denied that the payments were in the nature of spousal support. Debtor's inconsistent positions on whether the payments of the obligation are spousal support or not may be probative of their characterization as spousal support.

In terms of the potential modification of an award of support, the Ninth Circuit has held that whether a monthly payment is modifiable is not dispositive in classifying it as a domestic support obligation under the Bankruptcy Code. *In re Sternberg*, 85 F.3d at 1407. The parties' decisions to preclude modification, but also require monthly payments, push in opposite directions when considering whether the award is support. Alimony payments that require monthly installments are indicative of an intent for making support, while at the same time, typical "support" payments are temporary and/or modifiable to compensate for changed circumstances. In addition, the terms of the parties' settlement agreement stipulated that the payments would stop in December 2023, which spread the $306,000 award in $1,500 monthly increments over 17 years and 2 months. Such a figure may not be disproportionate if considered in the light of providing support for a single parent with two dependent minor children and without employment. In December 2023, the couple's second child will turn 18. Alimony payments, at least in part, are often intended to support a spouse who is caring for minor children without employment or other means of support until the children reach majority—which was contemplated by the preceding payment schedule.

1    The label placed on the payments by the parties in their settlement agreement

2    may also be evidence of intent, though it, too, is not dispositive.  The agreement was

3    categorized as alimony *in solido*, which under that state's law is a lump sum version of

4    spousal support payments.  Tenn. Code Ann. § 36-5-121(h)(1) (2012).

5    In exercising its independent judgment in determining the intent of the parties, the

6    court has considered state law for guidance on the question whether the state family law

7    court had intended to base the award of support on need.  The court has noted the policy

8    reasons behind the classification of "alimony" in Tennessee, and concludes that the state

9    law definition is broader than the federal bankruptcy standard for support.  Even if the

10   Tennessee trial court's label of alimony *in solido* in its decision July 15, 2010, were given

11   dispositive weight, that does not command this court to hold that the payments are

12   support.  In Tennessee, alimony *in solido* is granted as a lump sum payment and is not

13   open to modification, while its counterpart, alimony *in futuro*, can be modified based on

14   changed circumstances.  Both center around the need for support.  Tenn. Code Ann.

15   § 36-5-121(f) and § 36-5-121(h)(2) and (3) (2012).  The only difference between the two

16   classifications is that, when a Tennessee family law court selects *in solido* alimony, it

17   does so because it has the ability to determine a definite amount of money at the time of

18   its decision.  *Kelly v. Kelly*, No. M2008-02170-COA-R3-CV, 2009 WL 1312839 (Tenn. Ct.

19   App., May 11, 2009), at *1-2.

20   This state law concept is not completely consistent with the policy behind the

21   definition of support found in the Bankruptcy Code, which expresses concern for a

22   recipient spouse who cannot work, the potential for children to be neglected if the

23   recipient spouse does work, and an increased burden on the welfare system.  *See In re*

24   *Kritt*, 190 B.R. at 388, *quoting, Shaver v. Shaver*, 736 F.2d at 316 n. 3.  Rather, the

25   distinction in Tennessee law appears to merely be created with the purpose of finding a

26   method to distribute the monetary value of a known quantity, instead of distinguishing

27   between alimony payments that are subject to modification, and those that are not.

28   Indeed, common uses of alimony *in solido* in Tennessee are the payment of attorneys'

1   fees or of value of divided marital property.  *See Gonsewski v Gonsewski*, 350 S.W.3d

2   99, 113 (Tenn. 2011); *Burlew v. Burlew*, 40 S.W.3d 465, 471 (Tenn. 2001); *see also,*

3   *Final Judgment, Ashworth v. Ashworth, No. 164023-3, Chancery Court for Knox County,*

4   *Tennessee (Plaintiff's Trial Exhibit 42)*, entered on October 31, 2006, at 5 (attorneys' fees

5   of Creditor's attorney in amount of $40,000 awarded as alimony payable by Debtor).   .

6        Creditor cites *Disher v. Disher*—a Tennessee case that demonstrates how

7   Tennessee's alimony *in solido* concept is not identical to the concept of "support" unique

8   to the Bankruptcy Code.  *Closing Brief of Kathryn Ehrgott,* filed on May 4, 2012, at 10-11

9   and n. 55.  A Tennessee appellate court reversed an award of a $150,000 in damages for

10  a tort claim for the respondent spouse's negligent transmission of herpes to the petitioner

11  spouse for insufficient evidence of knowledge to support a finding of a duty of care.

12  *Disher v. Disher*, No. W2002-01421-COA-R3-CVA, 2003 WL 23100334 (Tenn. Ct. App.,

13  May 24, 2004), at *4-5.  Although the divorce court had granted rehabilitative alimony

14  payments as well, it had characterized the tort claim obligation as alimony *in solido.  Id.* at

15  *1.  Thus, simply because the Tennessee court in this case determined that the Final

16  Judgment Sum between Creditor and Debtor in this case was "alimony in solido" does

17  not necessarily mean that the award meets the federal definition of "domestic support

18  obligation" under the Bankruptcy Code.  Moreover, as Debtor argues, the Tennessee

19  court did not make its own independent ruling on the alimony label; rather it deferred to

20  the terms devised by the parties in the Final Judgment in the interest of honoring their

21  settlement agreement.  *See Final Judgment, Ashworth v. Ashworth, No. 164023-3,*

22  *Chancery Court for Knox County, Tennessee (Plaintiff's Trial Exhibit 42)*, entered on

23  October 31, 2006; *see also, Memorandum Opinion and Order, Ashworth v. Ashworth, No.*

24  *164023-3, Chancery Court for Knox County, Tennessee (Plaintiff's Trial Exhibit 71)*,

25  entered on June 15, 2010, at 3-4 ("Regardless of whether this Court would have had the

26  statutory or common law authority to impose *in solido* alimony . . . the Court can think of

27  no reason why the negotiated settlement between these parties should not be enforced

28  according to its terms.").

The crux of the Debtor's argument is that the $306,000 obligation to the Creditor based on the Final Judgment is not in the nature of spousal support because the parties were in reality settling a personal injury tort claim that she had against him for infecting her with a sexually transmitted disease. *Debtor's Brief re Closing Arguments re Debtor's Objection to Claim #2,* filed on May 4, 2012, at 6-10. That is, Debtor argues that Creditor used the threat of a multi-million dollar lawsuit in order to push him to accept a settlement of the tort claim, categorizing it as alimony to make any award due to this injury nondischargeable in any bankruptcy proceeding. *Id.*

The Debtor also testified that, by agreeing to pay what the parties labeled as "alimony," he believed the $10 million lawsuit would be dismissed and all matters of the divorce settled. *Trial Testimony of Matthew Ashworth, April 19, 2012*, 9:23 to 9:26 a.m.*; Debtor's Direct Testimony re Objection to Claim #2 of Kathryn Ehrgott,* filed on March 29, 2012, at 14-15. Debtor maintains that, were it not for the dismissal of the civil tort suit, he would not have agreed to the $306,000 payment. *Id.* This indicates that some of the motivation behind Debtor's desire to enter into the purported alimony agreement was to settle Creditor's tort claim, which in turn indicates that not all of the award was need-based support under the federal bankruptcy definition of support.

Debtor understood that the award would be characterized as a debt nondischargeable in bankruptcy, and at the same time would be alimony tax deductible for him, as indicated by his statements on the record at recitation of the settlement agreement. *Transcript of Proceedings, September 29, 2006, Circuit Court for Knox County, Tennessee, Kathryn E. Ashworth v. Matthew Banks Ashworth, No. 1-684-05 (Plaintiff's Trial Exhibit 40)*(MR. LOCKRIDGE [Creditor's family law counsel]: . . . It [the obligation] is not dischargeable in bankruptcy, being a support obligation and a domestic debt. . . .) (at page 12) and colloquy between Debtor and family law counsel at pages 35-36 indicating Debtor's understanding and agreement to the settlement terms; *see also, Final Judgment, Ashworth v. Ashworth, No. 164023-3, Chancery Court for Knox County, Tennessee (Plaintiff's Trial Exhibit 42)*, entered on October 31, 2006, at 4, ¶ 13 ("The

1   Husband's alimony obligation to Wife shall not be dischargeable in bankruptcy and

2   terminates only upon the death of the Wife or the amount having been fully paid with

3   interest, as outlined above."). Debtor argues that any agreement waiving his right to seek

4   a discharge of the obligation is unenforceable as contrary to public policy. *Debtor's Brief*

5   *re Closing Arguments re Debtor's Objection to Claim #2,* filed on May 4, 2012, at 3-4,

6   *citing inter alia, Hayhoe v. Cole (In re Cole),* 226 B.R. 647, 651-654 (9th Cir. BAP 1998).

7   While the court agrees that generally prepetition waivers of a discharge are contrary to

8   public policy and unenforceable, there does not seem to be any violation here to the

9   extent that the parties agreed in the recitation of their settlement that the obligation was a

10  domestic support obligation or other domestic relations obligation.  11 U.S.C. §§

11  101(14A), 523(a)(5) and (15).  The court makes its own independent determination here

12  whether an obligation is actually in the nature of support, and the court is not bound by

13  the labels that the parties place on the obligation.  *In re Sternberg,* 85 F.3d at 1405; *see*

14  *also,* 11 U.S.C. § 101(14A).  Moreover, the court is not making any determination of

15  dischargeability of debt because that issue is not presented here.  *In re Nelson*, 451 B.R.

16  at 924-925.  As to Debtor's understanding that he could claim payments of the obligation

17  as tax deductible alimony on his tax returns, the court does not give much weight to this

18  fact because the substance of the obligation as need-based support is the relevant

19  consideration.  *In re Kritt,* 190 B.R. at 388-389.

20      While the court recognizes the force of Debtor's arguments, the court is bound by

21  the controlling precedent of the Ninth Circuit in *Sternberg* as discussed above, finds that

22  Creditor has met her burden of proving by a preponderance of the evidence that the

23  $306,000 debt obligation in the Final Judgment was a "domestic support obligation"

24  within the meaning of Section 101(a)(14A) of the Bankruptcy Code, 11 U.S.C., in showing

25  that she actually needed spousal support at the time of the divorce, that the obligation

26  terminated on her death, that the payments of the obligation were to be made directly to

27  her and are paid in installments over a substantial period of time and that the parties in

28  their settlement agreement reflected in the Final Judgment gave the obligation the label

of alimony, or support.  Consequently, the court must conclude that under 11 U.S.C.

§ 507(a)(1), the claim of Creditor based on the Tennessee family law judgment is entitled

to priority status for the remaining balance due in the amount of $259,682.81.

There is simply no way to look past the evidence that Creditor was in a state of

need at the time of the divorce.  *Sternberg* holds that this is the key inquiry in determining

how the parties intended to characterize the obligation as support, which has been

consistently followed by other courts of this circuit.  *See also, e.g.*, *In re Nelson*, 451 B.R.

at 924 (holding a husband's payment of half of the monthly mortgage was not a priority

claim, in part because evidence did not show the wife needed support at the time of the

divorce); *In re Morgan*, No. 10-67114-elp13, 2011 WL 1598065, at *3-4 (Bankr. D. Or.

2011) (holding a $35,000 "equalization payment" was not support, in part because the net

income available to each party was "relatively equal").  Conversely, this court has held

that an "equalization payment" to be paid from marital property after the debtor spouse

defaulted on previously awarded spousal support payments was support because the

support later in arrears was based on an income differential at the time of separation as

the creditor spouse was receiving only limited disability payments while the debtor

spouse was fully employed as a police officer, and thus, as Debtor contends, labels are

not dispositive.  *Memorandum Decision re: Debtor's Objection to Claim of Irene Beckx,
Beckx v. Beckx (In re Beckx)*, Case No. 8:07-bk-13803 at 10-11 (Bankr. C.D. Cal.,

opinion filed July 22, 2008), *affirmed without published opinion,* 200 WL 35888261 (9th

Cir. BAP 2009).

Other factors in the *Sternberg* test point in different directions, but on balance,

indicate that the obligation was in the nature of support.  *In re Sternberg,* 85 F.3d at 1405.

That the Final Judgment was terminable only upon death and not remarriage tips in favor

of Debtor's position that the payments were not support since typically support payments

terminate upon remarriage as creditor has a new spouse to look to for support.  *Id.*; *see
also, In re Combs,* 101 B.R. at 616 (citations omitted).  Under *Sternberg,* this factor is not

dispositive since it did not qualify the obligation at issue from being determined as

support because it was terminable at death, but not remarriage.  This factor is not

dispositive since in *Sternberg,* it did not disqualify the obligation at issue from being

determined as support because it was terminable at death, but not remarriage. 85 F.3d

at 1406-1407, *citing Shaver v. Shaver,* 736 F.2d at 1316.  Moreover, the weight accorded

to this factor is perhaps lessened because it is tied to a need for support in childrearing

as the termination date for the payments was the month in which the parties' second child

reached majority at age 18.  *See, In re Gionis*, 170 B.R. at 682 (presence of minor

children is a factor indicating need for support).  Furthermore, as reflected in the Final

Judgment, that the payments of the obligation were to be made directly to her and are

paid in installments over a substantial period of time indicates that the obligation was

support in nature.

Also, the parties had assigned the label of alimony, or support, to the payments,

which was recited by agreement on the record and in the Final Judgment in settling the

divorce proceedings, and as reflected on Debtor's income tax returns as tax deductions.

*See In re Sternberg,* 85 F.3d at 1405; *In re Kritt*, 190 B.R. at 387-389.  But the court does

not accord much weight to Debtor's claiming the prior payments as a deduction for

alimony on his past tax returns on some quasi estoppel theory, because the substance of

the obligation as need-based support is really the relevant consideration.  *In re Kritt,* 190

B.R. at 388-389.   Thus, on balance, however, the *Sternberg* factors, especially, that

Creditor actually needed spousal support at the time of the divorce, tend to show that the

payments were support.

## 2. CIRCUMSTANCES AT BAR CALL FOR A TEST THAT HAS GREATER FLEXIBILITY THAN *STERNBERG*

While the court follows the binding precedent of the Ninth Circuit in *Sternberg* as it

must, the court is of the view that there is a good faith and reasonable argument to apply

a different rule in this case based on the circumstances of this case.  In this court's view,

the facts of this case present circumstances that appear to be different than the one

presented in *Sternberg*.  The situation in *Sternberg* involved the payment of additional

interim spousal support of monthly payments of $12,000 to the recipient spouse until the

paying spouse made a payment representing a division of property to the recipient

spouse, and the Ninth Circuit upheld the determinations of the lower courts that the

payments in the nature of support and thus non-dischargeable based on the need of the

recipient spouse at the time of the divorce and the large imbalance in relative incomes of

the spouses as the recipient spouse was unemployed and the paying spouse had salary

income of $100,000 a year and assets worth seven to eight million dollars.  85 F.3d at

1405-1406.  The case at bar involves a settlement of two distinct claims, one for spousal

support, and one for tortious injury, which essentially lumped the settlement payments

into one sizeable obligation, payable in monthly installments.  The evidence in this case,

particularly the testimony of the parties, indicates that the settlement payment was not

made *solely* as support, as the settlement of the non-support tort claim was a motivating

factor for both parties.  The *Sternberg* test may not contemplate such a situation.  As the

evidence in this case, both sides intended—at least in part—that the Final Judgment

settled the Debtor's civil liability for any personal injury the Creditor suffered from the

transmission by Debtor of a sexually transmitted disease.  On the other hand, at the time

of the divorce, Creditor, who was a single parent with very young children, one age 2 and

one born after separation, had a great need for the regular support payments to support

herself and their children.  Creditor's needs changed, though, because she remarried,

went back to school and became employed, and the children were growing up.  In the

Final Judgment, the parties chose for their own reasons to wrap the payments of the two

claims into one, which protected their disparate personal interests: for the Creditor, to

protect any monetary judgment against Debtor from a discharge in bankruptcy by

characterizing the payment on the judgment as support, and for the Debtor, to reduce

and liquidate the tort claim against him, even though the payment on the claim was not

entirely support.

The settlement of two claims is an important distinction from *Sternberg* in this

court's view.  During instances in which parties separated out payments into different

categories, courts focused on that distinction and analyzed them independently, finding

some payments to be in the nature of support and others not. *In re Waterman*, No. 4:11-

bk-02598-EWH, 2012 WL 2411945 (Bankr. D. Ariz., June 25, 2012) (holding a hold-

harmless provision to not be in the nature of support, while a separate "spousal

maintenance" lump sum payment was support); *Thorud v. Thorud (In re Thorud)*, No. 10-

6107-elp, 2011 WL 5079506 (Bankr. D. Or., Oct. 26, 2011) (holding a property division

judgment to not be in the nature of support, while separate, child custody payments were

support).

The possibility always exists for aggrieved parties to seek to disguise other,

unrelated payments as "support" by devising settlement agreements similar to the

Creditor's.  Thus, the *Sternberg* test for determination of the need for support at the time

of the divorce may be too rigid in consideration of whether support is needed over time in

light of changed circumstances of the parties.  Under *Sternberg,* the first and foremost

factor in characterizing a payment as support is the receiving spouse's need at the time

of the divorce.  While need is a compelling component, the *Sternberg* test has other

factors, yet the need at the time of the divorce is typically the one determinant factor of

intent.  To allow for more flexibility, the *Sternberg* test should to be altered to compensate

for changed circumstances.  Should this occur, courts in this circuit would have the ability

to require the recipient party to prove a level of current need—as of the petition date—in

order to continue to receive the payments with priority claim status.  This would both

prevent parties from couching certain payments as alimony in marital settlement

agreements, as well as avoiding a windfall for a party who does not actually need

continued support.  After all, as the Ninth Circuit has stated in *Chang*, "When determining

whether a particular debt is within the § 523(a)(5) exception to discharge, *a court

considers whether the debt is 'actually in the nature of . . . support.'*"  *In re Chang*, 163

F.3d at 1140 (emphasis added), *quoting, Shaver v. Shaver*, 736 F.2d at 1316.  In this

case, Creditor offered little or no evidence of her *current* need for support after her

remarriage, completion of graduate school and reemployment.  As the Ninth Circuit

1  further stated in *Chang*, determining whether a support payment carries non-priority

2  status is a balance between "the goal of providing a 'fresh start' to the bankrupt debtor,

3  [which] requires that "exceptions to discharge be confined to those plainly expressed"

4  and "an overriding public policy favoring the enforcement of familial obligations."  *Id.*,

5  *citing, In re Klapp,* 706 F.2d 998, 999 (9th Cir. 1983) and *Shaver v. Shaver,* 736 F.2d at

6  1316.  We must be cognizant of both of these interests.  If Creditor no longer has a

7  present need for support, but is still collecting the debt imposed by the divorce judgment,

8  this impairs the "fresh start" for Debtor from a discharge of debts in his bankruptcy case.

9  *Id.*

10       The Sixth Circuit has adopted an approach that recognizes support obligations to

11  a creditor spouse, but only when they are still *needed*.  In what became known as the

12  "present needs" test, the Sixth Circuit held, as part of a four-part test to determine

13  "support" under federal bankruptcy guidelines, that a court should consider the current

14  circumstances of the creditor spouse.  *Calhoun v. Calhoun (In re Calhoun)*, 715 F.2d

15  1103, 1109, 1110 n. 11 (6th Cir. 1983), *accord, Custer v. Custer (In re Custer)*, 208 B.R.

16  675, 680-681 and n. 3 (Bankr. N.D. Ohio 1997) (upholding as in the nature of support a

17  $450 weekly payment—$181,622 total—for buying out a creditor wife's stock holdings.[1]

18  The court found the wife was currently receiving $1,153 in income per month with

19  expenses of $1,000 per month.); *Johnson v. Seta (In re Seta)*, 45 B.R. 8, 8-9 (Bankr. S.D.

20  Ohio 1984) (holding as not in the nature of support an approximately $6,000-plus home

21

22  ─────────────────────
[1] The Sixth Circuit summarized the four-part test in *Calhoun* to determine whether an obligation
was in the nature of support as follows:

23       First, the obligation constitutes support only if the state court or parties intended
24       to creat a support obligation.  Second, the obligation must have the actually
         effect of providing necessary suppor.  Third, if the first two conditions are
25       satisfied, the court must determine if the obligation is so excessive as to be
         unreasonable under traditional concepts of support.  Fourth, if the amount is
26       unreasonable, the obligation is dischargeable to the extent necessary to serve
         the purposes of federal bankruptcy law.

27  *Fitzgerald v. Fitzgerald (In re Fitzgerald),* 9 F.3d 517, 520 (6th Cir. 1993), *citing, In re Calhoun*,
    715 F.2d at 1109-1110.

28

1  equity share payment to a debtor wife, who was currently being supported by a new

2  husband making $90,000 annually).

3      *Calhoun* involved a divorce settlement agreement as in this case.  The Sixth

4  Circuit reversed the grant of summary judgment that had held as support a debtor

5  husband's contract to hold harmless his ex-wife for loans totaling $27,000.  *In re*

6  *Calhoun,* 715 F.2d at 1104.  The court in *Calhoun* held that in inquiring whether the

7  debtor's obligation has the effect of providing support necessary to ensure the daily

8  needs of a former spouse are met, the existence of other property or "drastic changes in

9  the former spouse's capabilities for self support" might indicate that the debtor's

10 obligation is not necessary for support.  *Id.* at 1109.  If the creditor spouse is unable to

11 "maintain the daily necessities, such as food, housing and transportation" without the

12 debtor's objection, then payment of the obligation is to be considered "support."  *Id.*  The

13 *Calhoun* court was careful to note that this inquiry may modify a state court judgment, but

14 this may be unavoidable in applying a federal standard, and the concern over comity is

15 less important in situations involving an agreement of the parties as opposed to a

16 contested case.  *Id.* at 1109 n. 10.

17     In fairness to a debtor, who is seeking a "fresh start" in seeking bankruptcy relief

18 though a discharge of debt, there is no good reason why he or she should have to bear

19 the burden of paying "support" payments to a former spouse if support is no longer

20 actually needed.  Such a rule would require parties to present evidence of the creditor's

21 level of need, so that an appropriate level of "support" can be determined—or, at least,

22 remanded to the state court to do so.  Such a result would seem to be a fairer way of

23 resolving continuing issues over spousal support because a recipient spouse may still be

24 entitled to payment of need-based support based on the current financial situation, and a

25 debtor would not be unjustly saddled with a support obligation not actually needed where

26 there should be a "fresh start" from bankruptcy.  *See In re Chang*, 163 F.3d at 1140,

27 *quoting, In re Klapp,* 706 F.2d at 999 ("the goal of providing a 'fresh start' to the bankrupt

28 debtor, [which] requires that exceptions to discharge be confined to those plainly

1  expressed").  By basing the first priority status of "support" payments on a creditor

2  spouse's *current need* at the petition date, a court can effectively see through any divorce

3  agreement that combines support and non-support payments intended to limit a

4  bankruptcy debtor's discharge.

5       The *Calhoun* court also expressly stated that its rule only applied to *future*

6  payments, and had no effect on the dischargeability of past due obligations which

7  required a different analysis.  715 F.2d at 1109 n. 9.  Meaning, for example, in the case at

8  bar, the arrearages on Debtor's obligation now totaling over $28,000 would not be subject

9  to recharacterization as not support under the present needs analysis of *Calhoun.*

10      The court notes that the Sixth Circuit later expressed some reservations about

11 *Calhoun* after receiving some criticism of its ruling.  *See Fitzgerald v. Fitzgerald (In re*

12 *Fitzgerald)*, 9 F.3d 517, 520-521 (6th Cir. 1993).[2]  Concerned that courts had been

13 interpreting the test too broadly, the Sixth Circuit stated that the "present needs" test

14 should apply only when the intent, *independent of the creditor's current situation*, is

15 questionable as to whether the parties elected a payment to be in the nature of support.

16

_____

17 [2]  In *Fitzgerald,* Judge Kennedy who wrote for the court in that case and *Calhoun* wrote:

18     As the author of *Calhoun,* the writer regrets that it has been applied more broadly
       than intended.  Fortunately, a majority of courts in other circuits have rejected the

19     'present needs' test when applied to alimony or child support.  *See, e.g., In re
       Gianakis,* 917 F.2d 759 (3d Cir. 1990); *Forsdick v. Turgeon,* 812 F.2d 801 (2d

20     Cir. 1987); *Boyle v. Donovan,* 724 F.2d 681 (8th Cir. 1984).  *See also* Comment,
       *Striking the Needs Between Bankruptcy and Divorce: Developing a Standard for

21     the Classification of Domestic Obligations Under Section 523(a)(5) of the
       Bankruptcy Code,* 7 BANKR. DEV. J. 565, 591 (1990) (survey indicates that a

22     majority of circuits focus only on the intent of the parties at the time of divorce).
       Courts have criticized the 'present needs' test on various grounds including that it

23     permits undue federal interference with state court domestic authority, *Forsdick,*
       812 F.2d at 803-804; that it punishes the non-debtor spouse who has struggled

24     to become self-supporting, *Gianakis,* 917 F.2d at 763; and because the test
       would result in the discharge of an overwhelmingly high number of support

25     obligations because by the time a debtor files for bankruptcy, most former
       spouses will become self-reliant, *see In re Chedrick,* 98 B.R. 731, 734 (W.D. Pa.

26     1989).  *Calhoun* was not intended to intrude into the states' traditional authority
       over domestic relations and the risk of injustice to the non-debtor spouse or

27     children."

   9 F.3d at 520-521.

28

1    *Id.* However, this does not preclude the *Calhoun* test from being applied in determining

2    whether an award is support when the intent of the parties is questionable. *In re*

3    *Westerfield*, 403 B.R. 545, 558 (Bankr. E.D. Tenn. 2009) ("If the evidence [other than

4    present needs] leaves no doubt the obligation was intended to provide support and

5    actually provided support at the time of the divorce, then the court should not apply the

6    present needs test."). The *Westerfield* court also cautioned against applying too much

7    weight to the labels placed on the award by the parties. *Id.* at 556 ("The label should not

8    have too much influence on the outcome . . . : legal factors can lead the parties or the

9    court to give the obligation a label opposite its true function as understood by the parties

10   or the state court."). Even after the Sixth Circuit decided *Fitzgerald*, courts recognized

11   that the "present needs" test was still being applied in the Sixth Circuit. *In re Custer*, 208

12   B.R. at 680 n. 3.

13       The evidence of the circumstances here—the dismissal of Creditor's civil lawsuit

14   seeking substantial damages of millions of dollars based on a settlement for the nominal

15   sum of $1.00, evidence of Creditor's intent for continued compensation beyond

16   remarriage based on her physical condition from Debtor's allegedly tortious activity

17   couched as an inability to attract a man other than one of "modest means," the long 17-

18   year duration of the payments in the settlement agreement without adjustment for income

19   from reemployment of Creditor or from a new spouse upon remarriage of Creditor—raise

20   questions whether the entire $306,000 obligation should be considered actual support

21   based on need. With some doubt as to the actual nature of Debtor's $306,000 obligation

22   in the Final Judgment as support, in the court's view, the present needs of the Creditor

23   should be a factor in the determination, though this is not the current law of this circuit as

24   reflected in *Sternberg*.

25       This court is of the view that the Sixth Circuit's approach in *Calhoun* looking at the

26   present needs of the parties may better effectuate the policies of the Bankruptcy Code to

27   validate an award of support based on need as entitled to priority and nondischargeable

28   status, but also to give recognize of the bankruptcy debtor's need for a "fresh start" by

33

1   permitting a discharge of debts not needed for support. *See In re Kritt*, 190 B.R. at 388-

2   389, *quoting, Shaver v. Shaver*, 736 F.2d at 316 n. 3.  A court making a determination of

3   whether a debt is a domestic support obligation under 11 U.S.C. § 101(14A) should be

4   able to sort out a claim labeled as spousal support that contains both need-based priority

5   and non-need debt obligations.  Although this court follows the *Sternberg* test because it

6   is the law of the Ninth Circuit, the court believes that the test is not flexible enough for the

7   circumstances of this case because it does not allow for appropriately balancing the goal

8   of a bankruptcy debtor to obtain a financial "fresh start" though a bankruptcy discharge

9   and ensuring a creditor holding a claim for spousal support based on need is accorded

10  proper treatment under the Bankruptcy Code.  Rather, in this court's view, the rule

11  focusing the need for support at the date of the divorce may be contrary to other policy

12  objectives, such as according priority status to support only if it is actually needed.

13          The circumstances of this case are unfortunate to say the least, but it is an

14  example of why the present needs test should be considered and adopted.  To a large

15  extent, Creditor is morally responsible for this situation due to his marital infidelity, not

16  only breaking his marriage vows, but transmitting an infectious venereal disease to his

17  unsuspecting spouse, Creditor, which acts should have been compensated through the

18  civil tort system.  But the precise issue before the court is whether or not the claim

19  asserted by Creditor against Debtor is in the nature of support based on actual need,

20  which serves a different societal interest.  In an unusual case like this one, the present

21  needs test could serve as a way to sort out a claim based on its true nature to effectuate

22  the policies of the Bankruptcy Code, that is, what is appropriately a claim for need-based

23  support and what is a claim not based on need for spousal support, which follows the

24  purpose of the Bankruptcy Code: to protect truly need-based support.  In this court's

25  view, the circumstances in this case are unusual because the support obligation was

26  made by a family law court in a state, Tennessee, whose law permits alimony to be paid

27  in a lump sum, or liquidated, amount, but does not permit such alimony to be modified for

28  changed financial circumstances.  Here, the lump sum alimony payment was $306,000 to

be paid in monthly installments of approximately $1,500.00 over 17 years, which is a long period of time, regardless of events which would ordinarily affect the recipient spouse's actual need for support, such as remarriage and income of a new spouse, income from reemployment of the recipient spouse, and the relative short duration of the subject marriage.  Debtor has made it difficult for himself in this case because he agreed to waive these concerns by agreeing to this obligation to pay alimony *in solido*, even though he was then represented by family law and personal injury defense counsel, which he now argues was under pressure or duress of some kind.  *Debtor's Brief re Closing Arguments re Debtor's Objection to Claim #2,* filed on May 4, 2012, at 6-13.

Debtor also makes his position difficult to accept because he argues that Creditor is not entitled to any award of the spousal support of $306,000, even at the time of the divorce, when the circumstances as discussed above, justify the award of spousal support in this court's view.  As discussed above, the evidence in this case indicates that at the time of the divorce, Creditor had an actual need for spousal support, and that the initial monthly installment payments of about $1,500 were reasonable in amount based on her actual need at the time.

Moreover, Debtor does not offer a principled method, or any evidence, to separate need-based support or non-need "support" based on changed circumstances, and thus, for Debtor, it is "all or nothing."  *Id.* at 6-15.  But still, the court has some lingering concern as to whether Creditor had a continuing actual need for spousal support based on events subsequent to the time of the divorce which would be ordinary considered in determining a present actual need for support and believes that the present needs analysis would address that lingering concern.  To address some of the criticisms of the *Calhoun* rule noted by the Sixth Circuit in *Fitzgerald,* this court would say that there would be no due federal interference with state court domestic relations authority because the court should make its own independent determination of whether a debt is actually in the nature of support and that such a rule does not punish the non-debtor spouse who has struggled to become self-supporting because it would seem that it would be good public policy to

1   encourage the non-debtor spouse to be self-supporting through training and employment

2   over a reasonable period of time.  *See In re Fitzgerald*, 9 F.3d at 520-521 (citations

3   omitted); *see also, Disher v. Disher,* No. W2002-01421-COA-R3-CVA, 2003 WL

4   23100334, at *5 ("the true purpose [of alimony] should be to aid the disadvantaged

5   spouse to become and remain self-sufficient and . . . to mitigate the harsh economic

6   realities of divorce."), *citing inter alia, Anderton v. Anterton,* 988 S.W.2d 675, 682 (Tenn.

7   Ct. App. 1980)(internal quotation marks omitted).  Here, the circumstances indicate that

8   by relying upon Debtor's payment stream over 17 years, a long period of time,

9   approximately three times the length of the parties' marriage, Creditor despite her

10  remarriage and her ability to work after finishing her graduate education has no incentive

11  to be self-sufficient, and that state of affairs does not seem to promote the true purpose

12  of support as stated by the Tennessee court in *Disher* as well as the statement of policy

13  of the courts in this circuit that support should be need-based.  *See, e.g., In re Sternberg,*

14  85 F.3d at 1405 (courts are to determine whether an obligation is actually in the nature of

15  support), *citing, Shaver v. Shaver,* 736 F.2d at 1316.

16      This memorandum decision constitutes the court's findings of fact and conclusions

17  of law.  Counsel for Creditor is hereby ordered to submit a proposed judgment consistent

18  with this memorandum decision within 30 days of entry of this decision.

19      Also pending before the court is the contested matter of Creditor's objection to

20  confirmation of Debtor's Amended Chapter 13 Plan.  Because the resolution of Debtor's

21  objection to Creditor's claim has an effect on the confirmability of the Amended Chapter

22  13 Plan and the interests of other parties, such as the remaining creditors and the

23  Chapter 13 Trustee, may be involved, the court does not now rule on confirmation of the

24  Amended Chapter 13 Plan and hereby sets a further hearing on confirmation of Debtor's

25  Amended Chapter 13 Plan for November 28, 2012 at 2:00 p.m. in Courtroom 1675,

26  Royal Federal Building, 255 East Temple Street, Los Angeles, California.  The status

27  conference on confirmation of the Amended Chapter 13 Plan set for October 3, 2012 at

28  1:30 p.m. is hereby vacated.  Counsel for Debtor is ordered to give written notice of the

1    further confirmation hearing on November 28, 2012, and the parties and counsel,

2    including the Chapter 13 Trustee, Amrane Cohen, may participate in this hearing by

3    telephone in accordance with the court's telephone appearance procedures.

4         IT IS SO ORDERED.

5

6                                          ###

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    DATED: October 1, 2012              _____
                                         United States Bankruptcy Judge
26

27

28

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*)  **MEMORANDUM DECISION RE DEBTOR'S OBJECTION TO CLAIM NO. 2** was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I.    SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served on the following person(s) by the court via NEF and hyperlink to the judgment or order.  As of **October 1, 2012**, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below:

- Amrane (SA) Cohen (TR)      efile@ch13ac.com
- Richard G. Heston      rheston@hestonlaw.com
- Richard S Ralston      richardr@w-legal.com, adaml@w-legal.com
- Mark C Schnitzer      mschnitzer@rhlaw.com, mschnitzer@verizon.net
- Scott Talkov      stalkov@rhlaw.com
- United States Trustee (SA)      ustpregion16.sa.ecf@usdoj.gov

**II.    SERVED BY THE COURT VIA U.S.  MAIL:** A copy of this notice and a true copy of this judgment or order was sent by the clerk of the court by United States Mail, first class, postage prepaid, to the following person(s) and/or entity(ies) at the address(es) indicated below:

**Debtor:**
Matthew Banks Ashworth
668 N. Coast Highway #1350
Laguna Beach, CA 92651

**III.    TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S.  Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s), and/or email address(es) indicated below: